UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
AMICAS, INC.,                                       )
                                                    )
         Plaintiff,                                 )
                                                    )
v.                                                  )         Civil Action No. 08-11589-LTS
                                                    )
GMG HEALTH SYSTEMS, LTD. d/b/a                      )
GONZABA MEDICAL GROUP,                              )
                                                    )
         Defendant.                                 )
_____)


MEMORANDUM AND ORDERS ON
CROSS MOTIONS FOR SUMMARY JUDGMENT,
PLAINTIFF'S MOTION RE: WAIVER OF PRIVILEGE
AND PLAINTIFF'S MOTION TO STRIKE

December 3, 2010

SOROKIN, M.J.

Currently pending are the following motions:  (1) the Plaintiff's Motion for Partial

Summary Judgment;  (2) the Defendant's Motion for Summary Judgment on its Counterclaims;

(3) the Plaintiff's Motion for a Determination that the Defendant has Waived Privilege; and (4)

the Plaintiff's Motion to Strike.   The first motion is ALLOWED and the remainder are

DENIED.

I.       PROCEDURAL AND FACTUAL BACKGROUND.

The Plaintiff, Amicas, Inc., is a provider of medical imaging and information

1

management solutions.  Docket # 48 at ¶ 1.  The Defendant, Gonzaba Medical Group (GMG), is a medical provider of radiology services and a consumer of radiology-related technologies such as Picture Archiving and Communications System (PACS) and Radiology Information System (RIS).  Id. at ¶ 2.  Between 2003 and 2006, GMG used a patient identification software system and a billing software system sold by a non-party vendor, Sage Software.  Docket # 41 at ¶ 1. In September, 2006, GMG sought a new vendor of PACS and RIS software.  Id.  GMG was seeking automation of its radiology charges (without the need to conduct any manual input of data) in order to avoid the revenue loss it had experienced as a result of incomplete capturing of its charges.  Id. at ¶ 2.  In negotiating a purchase of Amicas' products, GMG indicated that it needed systems that were able to interface with the Sage patient information system GMG already was using.  Id. at ¶ 3.  To "interface" means to transfer and share data between systems. Docket # 54 at ¶ 5.

During sales negotiations, Amicas understood that GMG was running Sage systems, and told GMG that the Amicas products under consideration could interface with them.  Docket # 47-8 at 13.  The Amicas proposal to GMG included both an inbound interface from Sage's patient management system to the Amicas RIS, as well as an outbound interface from the Amicas RIS to the Sage billing software.  Docket # 53 at ¶ 6.  This outbound interface is that aspect of GMG's systems by which data from Amicas's RIS program was sent to a shared server from which the Sage billing software could then access and retrieve data to process GMG's radiology procedures for payment and it has been referred to by the Parties as "the Chargeout Interface." See e.g., Docket # 53 at ¶ 23; Docket # 54 at ¶ 4.

In an email following up on its sales presentation, Amicas urged GMG to consider in

evaluating all the quotes they received whether "Interfaces [are] Complete and Included? (ADT Charge out to Billing)?" and also indicated that it wished to see line items comprising their competitors' systems so that Amicas could make "apples to apples" comparisons concerning, "most importantly, a complete interfacing strategy to connect EVERYTHING into a seamless system." Docket # 47-1 at 5-6 (emphasis in original).

<u>Relevant Provisions of the Agreement</u>

On October 25, 2006 and October 27, 2006, Amicas and GMG executed various documents, including the Software License, Hardware, Services and Support Agreement (the Agreement), by which Amicas granted to GMG a non-exclusive license to use Amicas's RIS and PACS. Docket # 48-1 at 22-36. Under the terms of the Agreement, GMG was to pay $1,009,548.00 to Amicas over five years. <u>Id.</u> at § 3.3 and Schedule A. The Agreement provides in part that the Parties shall "make reasonable efforts through negotiation to settle any disputes arising out of or related to the Agreement" and that the Agreement "shall be construed and interpreted in accordance with the laws of Massachusetts and any dispute shall be resolved in a forum located within Massachusetts." <u>Id.</u> at § 14.3.

The Agreement contains the Warranty that,

> "[p]rovided [GMG] complies with the terms of this Agreement, AMICAS warrants that, during the ninety-day period following the Go Live Date, the AMICAS software will substantially conform to the Documentation[1] when used by [GMG] in a manner that is consistent with the Documentation. AMICAS does not warrant that the Software described herein will meet [GMG's] requirements."

---

[1] The "Documentation" has not been provided to the Court. At the hearing on these motions, counsel for both Parties represented that the documents constituting "the Documentation" within the meaning of the Agreement were of a highly-technical nature and were not likely to assist the Court in resolution of the motion. Neither Party has since sought to supplement the record with those documents which constitute the Documentation.

3

Docket # 48-1 at § 9.1.

Section 9.2 explicitly disclaims any warranties not set forth in the Agreement itself.  Id. at § 9.2.  Section 1.1 of the Agreement is an Integration Clause providing that the written Agreement was the entire agreement between the Parties and supersedes any previous or contemporaneous agreements not contained therein.  Id. at § 1.1.  Section 4.2 provides that

> [i]n the event that either party materially defaults in the performance of any of its obligations under this Agreement and does not substantially cure such default, or commence a cure, within twenty (20) days after being given written notice specifying the default, the non-defaulting party may, by giving notice to the defaulting party, terminate this Agreement as of a date specified in such notice of termination.

Id. at § 4.2

Installation

Adam Helms, Amicas's implementation engineer on the GMG project, affirms that, "[f]or interfaces to work properly, the interfacing software vendors and the customer need to work together to facilitate the continuing successful transfer of data between the systems."  Docket # 54 at ¶ 12.  During the installation of Amicas' software, Amicas relied upon personnel from Sage to implement portions of, and to conduct testing upon, the Chargeout Interface.  See, e.g., Docket #47-8 at 6; Docket # 47-3 at 16-21 (November, 2006, email discussions between Amicas, Sage and GMG personnel about, inter alia, expectations and understandings related to the construction of the GMG Chargeout Interface); Docket # 54, at ¶¶ 10-11.

In describing to Sage its understanding of the anticipated Chargeout Interface, Amicas wrote that:

> Outbound info from [Amicas'] system to [Sage's] is only related to chargeout billing. Upon completion of various procedures within our RIS, Gonzaba staff cause the RIS to generate one or more batch charge out files. These files are placed on our server on shared directory. The files need to be processed in some manner into [Sage's] billing management software. Since we only place these files in our system in a shared folder and nothing more, then at this point either [Sage's] system can access the shared folder to get and use the file data, or it can be emailed or otherwise manually copied by Gonzaba staff from one computer to the other. Then you parse the data and process the billing info.

Docket #47-3 at 18.

During these discussions, Amicas stressed to Sage that (as is described in Sage's Intergy documentation), Sage would need to create an HL7[2] Batch Preprocessor, because Amicas (as is required by Sage) would send the chargeout batch files to the shared drive in its own proprietary format. Docket # 47-3 at 16. Sage's own Intergy documentation recited that:

> The sender and receiver of this information must agree on the data content and layout of the batch file within the rules and limits of the interface. Remote systems commonly choose to send this data using their own customary proprietary format. In such cases, our Intergy HL7 Batch Processing Interface team is able to handle the importing of such custom batch files by developing a corresponding Batch Preprocessor. In this type of interface, it is imperative that the remote system periodically produce these batch files in the agreed consistent format making sure that all the requirements mentioned below are met on each and every delivered batch file.

Quoted at Docket # 47-3 at 16.

Accordingly, the November, 2006, email exchanges included requests from Amicas for Sage "to provide files, data dumps, etc., whatever you would call them that would contain lists of known referring physicians, zip codes, diagnosis codes, procedure codes, insurance companies

---

[2] An Amicas engineer affirms that "HL7 is a specification standard used in nearly all healthcare software in this country (and worldwide). Use of this common standard facilitates the sharing of data between different software systems, which — because of the varied products in the field —occurs in almost every medical office and hospital." Docket # 54 at ¶ 6.

. . . we may be able to convert this information into the RIS to pre-build some of these data elements for Gonzaba."  <u>Id.</u> at 18.

As implemented, one of GMG's billing coders, Lori Armstrong, would produce a batch file (consisting of patient demographics, exam types, diagnosis codes and patient identifiers) from the Amicas RIS software.  Docket # 48-4 at 20.  Armstrong would then review that file, make corrections, and save it to a shared drive.  <u>Id.</u> at 20-21.  GMG employee Robyn Syring would then import the file from the shared drive onto the Intergy server.  <u>Id.</u>  She would then execute the preprocessing program Sage had created, and would receive a report identifying any errors.  <u>Id.</u>  She would then work with Sage to resolve any errors.  <u>Id.</u> at 21.

GMG's staff was not sophisticated with regard to information technology.  It employed no full-time IT professional.  Docket # 52-2 at 16.  Elsa Vasquez, who affirms that she was the GMG employee "with responsibility for ensuring that the practice's software and hardware solutions functioned effectively" (Docket # 18 at ¶ 3), had not by the time of her deposition heard the terms (central to an understanding of the Chargeout Interface) "shared drive" or "batch file" and/or did not understand their meaning.  Docket #52-2 at 10-11.  Although GMG employed a series of consultants on IT matters, they appear to have played no role with regard to the implementation of the Chargeout Interface.  <u>Id.</u> at 16.  Helms affirms that he repeatedly explained to GMG that "[t]he existence of interfaces did not mean that no manual data entry would ever be required in the systems themselves  . . . [and explained] the importance of consistency and accuracy in GMG's data entry."  Docket # 54 at ¶ 8.

Because GMG delayed a decision on whether to purchase data conversion services, or to manually enter data themselves (<u>See</u> Docket #52-6 at 17-18), and also because Sage did not

complete its portion of the implementation of the Chargeout Interface until July, 2007, the

Chargeout Interface was not ready on March 13, 2007, at which time GMG began using the other

modules of the system purchased from Amicas (the "Go-Live Date"), including the inbound

interface.  Docket # 47-8 at 8; Docket # 54, at ¶¶ 10-11.  GMG accepted that the Chargeout

Interface was not ready at that time and agreed to process charges manually (See Docket # 47-8

at 3)(Elsa Vasquez confirms accuracy of internal Amicas email stating, "Chargeout processing

into Intergy.  No word from [Sage] when this will be ready.  Elsa was okay with this and wants to

process charges manually").

      GMG seemingly disputes that the Chargeout Interface was not ready because of delays

attributable to Sage, asserting that "[n]o affidavit of record fact shows Sage excuses Amicas."

Docket # 49 at 11.  However, GMG has adduced no evidence to the contrary to rebut the

assertion made by Amicas's affiant (who was the implementation engineer responsible for setting

up the inbound and chargeout interfaces) that lack of information from Sage delayed the

implementation.  Amicas' position is also buttressed by deposition testimony and emails

suggesting that in February, 2007, Amicas was waiting for information from Sage needed to

complete the Chargeout Interface.  See, e.g., Docket # 47-8 at 4 (Elsa Vasquez of GMG testifies

that she received an email (Docket # 52-3 at 92) from Amicas titled "Gonzaba Reasons Go Live

Not Ready" which stated with regard to "Chargeouts Processing Into Intergy" that "No word

from Intergy [i.e., Sage] when this will be ready.  Although Gonzaba can work around this with

manual billing, it is another open issue that should be completed with Intergy"); Docket 47-8 at 8

(Vasquez received January 8, 2007, internal Amicas email indicating "until Intergy finally sends

us some real messages for demographics input, we won't know how or what needs to be fine

tuned, if anything"); Id. (discussing similar February 2, 2007, email).

<u>Use of the Amicas System by GMG</u>

Sage completed its portion of the Chargeout Interface work by July, 2007. Docket # 54 at

¶ 11. Beginning on approximately July 24 or 27, 2007, GMG used the Chargeout Interface, and

manually corrected any errors that occurred. Docket #52-8 at 8-10. On July 24, 2007, GMG

reported to Amicas that a test of the Chargeout Interface had produced errors in 2 of 220 names

processed. Docket # 52-3 at 3.

The next contact which appears in the record between Amicas and GMG concerning

difficulties with the Chargeout Interface occurred in early August, 2007, when GMG employees

noticed that Intergy was incorrectly displaying the physician who read radiology films as the

referring physician and raised this issue with Amicas. Id. at 9-10. On August 15th, Amicas

responded by asking to examine the batch file that Amicas' RIS product had produced and which

was accessed by Intergy in order to populate its data fields. Id. On August 30, 2007, Amicas

responded that its review of the batch file showed that its RIS product had provided the correct

provider information in the course of creating the batch file which Intergy accessed and that the

error lay with Sage/Intergy's processing of the accurate batch file.

> "If I understand this correctly you are expecting to see the referring physician listed
> on this screen within Intergy? If so then the Intergy folks will need to populate this
> field with the [RIS] referring physician that comes over in the chargeout file in field
> PV 1.8. It looks like they are currently populating it with the reading physician from
> field PR1.12 of the chargeout file."

Id. at 6.

GMG's only response was that this was a new type of error which had not occurred in

previous testing. Id. at 6. On September 10th, GMG personnel discussed internally whether or not Amicas had responded further to the problem, and GMG then made a further email inquiry to Amicas. Id. Amicas responded the next day by reaffirming the content of their August 30th email – namely, that the issue needed to be resolved by Sage. Id. at 5. GMG forwarded the entire email thread to its Sage contact person and the record reflects that Sage opened a support issue on September 11, 2007. Id. How Sage responded is not apparent on the record before the Court. But there is, in any event, no indication in the record that this particular issue was caused by anything Amicas did or failed to do, and the record as it stands suggests the opposite – that this particular set of errors was something to be remedied by Sage. Another issue appears to have been resolved in less than one week (by October 3, 2007) by direct communication between Sage and Amicas. See Docket # 52-3 at 12-13. There is no other record before the Court of specific problems.

By "late 2007," however, GMG had decided that it was more efficient to simply process the charges manually than to use the Chargeout Interface and then correct the resulting errors. Id. GMG concedes that it did not notify Amicas that it was no longer using the Chargeout Interface and that once it began processing all of its charges manually, it no longer communicated to Amicas about the Chargeout Interface at all. Id. at 11. Elsa Vasquez, the GMG Imaging Services Coordinator/Radiology Manager, with responsibility for ensuring that the practice's software and hardware solutions functioned effectively (Docket # 18 at ¶¶ 2-3), was unable to say in her testimony whether the Chargeout Interface had ever been used in a live environment. Docket # 47-8 at 4. However, GMG's 30(b)(6) designee testified that GMG was using the Chargeout Interface after July 24 or 27 and then correcting resulting errors. Docket # 48-4 at 22.

9

Vasquez was also uncertain whether anyone at GMG had ever determined whether it was Amicas which was to blame for the perceived failure of the Chargeout Interface (as opposed to Sage, or even GMG itself) and she was unable to articulate any specific failure of Amicas, other than the general observation that the Chargeout Interface did not work.  Docket # 47-8 at 6-7.

GMG's Negotiations With Sage And Dissolution of Relationship With Amicas

By November, 2007, GMG was talking to Sage about replacing its Amicas products with Sage products, although these efforts did not culminate in a contract between Sage and GMG for approximately another seven months.  See Docket #s 48-4 at 33-34; 48-5.  By mid-February, 2008, those discussions had proceeded to the point that Sage was demonstrating their RIS product to GMG and was providing sales quotes.  Docket # 48-4 at 28-29.  Sage also reviewed some documentation related to "lost charges" and on March 2, 2008, advised GMG's CFO that "[o]ur experts feel that almost 100 percent of those are due to errors in having disparate systems and would be eliminated by using our RIS system."  Id. at 29 (GMG's 30(b)(6) designee confirming content of email to GMG from Sage).

On February 4, 2008, the Amicas salesman (Mark Bowman) visited GMG, and internal emails between Bowman and the Amicas sales team indicate that Dr. Gonzaba had made reference to "problems" and that in Bowman's view, a new GMG IT consultant and a new GMG CFO (Christina Arredondo) were now advising Dr. Gonzaba with the result that the GMG team were trying to get Amicas "to break our 5-year RIS agreement, which is not going to happen." Docket # 47-4 at 11.

On the following day, Elsa Vasquez inquired of Adam Helms (the Amicas implementation engineer who had set up the Chargeout Interface), "can you tell me where we are

10

with this interface?" Docket # 52-3 at 16. Vasquez testified that the inquiry was made at Arredondo's request. Docket #52-2 at 24. Helms responded with confusion and indicated that he believed the interface to have been completed. Id. Helms affirms that this inquiry came "after months of silence." Docket # 54 at ¶ 14. Vasquez conceded in her deposition testimony that although she had been in contact with Amicas with increasing frequency in late 2007, her last communication with Helms or Sage with regard to the Chargeout Interface in particular had come perhaps as long as seven months prior, and no less than five months prior. Docket # 52-2 at 23-24.

Helms affirms that in response to the 2008 inquiry, "AMICAS's efforts to solve the perceived problems with the interface were successful. I identified and solved problems caused by GMG's failure to maintain consistent sets of data. I needed to clean up the duplicate data that GMG had compiled during the prior year as a result of user error and failure to report issues to AMICAS or Sage." Docket # 54 at ¶ 15. He adds that Amicas completed its portion of the work by May, 2008, but that GMG never tested the work, despite repeated requests that it do so. Id. at ¶ 16.

Emails (both internal Amicas emails, and emails with Sage) confirm that throughout May, 2008, Sage and Amicas were engaged in a cooperative effort to, inter alia, clean up data issues in the RIS database and to optimize Sage's batch charge preprocessor. For example, on May 5, 2008, Janet Johnson of Sage emailed Amicas and GMG personnel summarizing a meeting in which certain tasks were assigned to Amicas' Helms (clean up of patient data) and others to Sage personnel (optimizations to the batch preprocessor). Docket # 47-5 at 6. A subsequent meeting of uncertain date (but prior to May 20) resulted in agreement that Helms

11

would prepare a test system to accept new patient demo data from Intergy and that once that was reviewed, there would be "a new patient push into the production system" in order to be sure that patients in both the Amicas and Sage/Intergy databases had the same patient and chart numbers. Id. at 7. The final step would be that Sage would test the Chargeout Interface. Id.

On May 20, 2008, Amicas personnel discussed the Chargeout Interface issue in a series of internal emails. Docket # 47-5 at 8-14. When asked by Vice President and General Manager Mike Lampron if anyone knew "anything about a Sage interface at Gonzaba," Helms responded that GMG had "pulled me back into [this] recently" and he provided a timeline of the implementation of the Chargeout Interface. Id. at 12-13. He called attention to a lack of functionality in Sage's HL7 system which he said Amicas had corrected for with additional work. Id. at 13. He noted that Intergy could not process the standard chargeout files from the Amicas' RIS because Sage said that "patients could not be processed unless they came in with the Intergy patient [ID]." Id. Changes were made in the inbound interface to cause the Intergy patient ID to be assigned as their Amicas RIS number in order to facilitate processing in the Chargeout Interface. Id. Amicas then provided GMG with a list of existing patients who would need their ID numbers corrected in Intergy "in a way to trigger a demographic update back to VSRIS." Id. Helms notes that now a year later, GMG claimed that the "standard" Chargeout Interface had not been completed, when in fact "with our standard chargeout file there is nothing to enable/configure on our side. It works out of the box." Id.

In summarizing GMG's concerns on May 20, 2008, Kurt Hammond, the Amicas Vice President for Sales, noted that GMG believed that "it is [Amicas'] fault that the three companies (Gonzaba, AMICAS and Sage) haven't gotten together to finish the original deployment, because

we were the 'Prime' on the deal . . . [and] should not have gone away until everything was working." Id. at 9. Hammond notes, "not sure what happened here, but I think we made some assumptions that they were going to do the work and complete the interface, but never did, we should have confirmed it was working, correct?" Id.

The work in 2008 to repair the databases and to tweak the Chargeout Interface did not proceed smoothly. GMG's testers complained that their work was constantly interrupted by the training interfaces being down. See e.g., Docket # 47-4 at 3-6. In Amicas' view, some of these issues were caused by problems with GMG's own systems (e.g., regarding issues with Gonzaba's server on May 27) and others were apparently caused by Amicas (e.g., Id. at 5, regarding invalid configurations of the interface on May 19). GMG seemingly acknowledged that "the record variances that somehow got created in RIS live" were a part of the problem and that they needed to be repaired before work on the interfaces could succeed. Id. at 6.

On June 3, 2008, Kurt Hammond, Amicas' Vice President of Sales, emailed Tim Stampp, the IT consultant retained by GMG, attempting to discern whether GMG would resume payments now that "progress is being made and we are on the last leg of getting the interface complete." Docket # 47-6 at 2. Stampp passed the email on to GMG's CFO without comment, and the record is silent as to whether Stampp responded. Id. at 3. The testing of the Chargeout Interface stalled thereafter. On June 5, 2008, Helms reported that he had completed his re-configurations of the interface, and Sage was waiting for Adele Rountree, who was testing for GMG, to inform them when testing of the tweaked Chargeout Interface could begin. Id. at 8. Rountree informed Sage and Amicas personnel that she would be unable to complete testing prior to her absence the following week. Id. On June 17, Sage asked Rountree if she was ready to resume testing. Id.

The record before the Court does not contain any response.

<u>Termination and Cure Attempts</u>

On June 20, 2008, Sage forwarded to GMG for signatures contracts for the replacement of Amicas' products with Sage products. Docket # 48-5 at 2. On June 30, 2008, GMG notified Amicas in writing pursuant to § 4.2 of the Agreement that "[e]ffective today, you are hereby put on notice that GMG is providing its 20 days notice to Amicas, Inc. for failing to conform to the Documentation and not delivering a functional product." Docket # 48-3 at 11.

Amicas's immediate response to GMG was confusion, noting that the interface was nearly complete and that "for the past month Amicas has been waiting to complete this project based on results both Gonzaba and Sage were to provide." Docket # 47-6 at 7 (citing emails at <u>Id.</u> 8-9). Amicas' Account Manager Amanda Griffin attempted to reach out to Sage on July 3, 2008 to determine the status of the interface. <u>Id.</u> at 17. Janet Johnson of Sage forwarded the email to GMG's CFO and asked how to respond because, "[m]y assumption is that we will abandon this project and move toward an interface between Intergy RIS and Intergy PACS. If I'm incorrect, we should proceed with the HL7 interface with Amicas. Please let me know." Docket # 48-4 at 31.

On July 9, 2008, Paul Barnes (Amicas' Manager of Account Management) met with Dr. Gonzaba, Cristina Arredondo (the GMG CFO) and Elsa Vasquez. Docket # 47-7 at 2. At this point, GMG had already decided to replace Amicas software with Sage software. Docket # 48-3 at 8). On the same day, Barnes noted in internal emails that Sage had been instructed by GMG not to communicate with Amicas any further concerning the Interface, and that a cure was not possible without the cooperation of both Sage and GMG. Docket # 47-7 at 4.

Regarding the meeting, Dr. Gonzaba testified at his deposition that "I don't recall that we

were attempting to work with AMICAS to solve the problem after the termination . . . I recall that we had already made up – made a decision to terminate AMICAS." Docket # 48-3 at 8. He did not recall telling Barnes at the July 9, 2008, meeting that he was expecting Amicas to fix the problems with the interface. Id. He testified that although he did not recall telling Barnes that GMG's relationship with Amicas was over, he "just assumed that he knew." Id. He didn't recall ever discussing any post-termination cure attempts by Amicas with GMG's CFO, nor did he know if anyone at GMG ever spoke with Adam Helms again about fixing the interface. Id. On the other hand, Barnes' email summary of the July 9, 2008, meeting with GMG includes a notation that, "Dr. Gonzaba did not press cancellation, but willing [sic] to see if anything will be different after my visit." Docket # 47-7 at 2. A second email summary of the meeting by Barnes also suggests that he left the meeting with the impression that he was to present a plan to GMG within five days for making the interface work. Docket # 47-7 at 4. Barnes also stressed the need for this plan to illustrate for GMG the necessity of cooperation between Sage and Amicas if the problem was to be resolved. Id.

Amicas' July 17, 2008, response to GMG's termination included the objection that because GMG had failed to describe Amicas' failure to conform to the documentation with any specificity, Amicas was unable to respond, and also asserted that the 90-day Warranty period had long expired and that GMG thus had no termination rights pursuant to that provision. Docket # 48-3 at 13.

On September 17, 2008, Amicas filed this action, alleging that GMG was liable to it for: Breach of Contract (Count I); Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II); unfair and deceptive trade practices in violation of M.G.L. c. 93A (Count III); and,

Unjust Enrichment (Count IV).  Docket # 1.

On November 6, 2008, GMG counterclaimed: asserting Breach of Contract by Amicas (Count I); seeking a declaratory judgment that it validly terminated the Agreement (Count II); asserting Breach by Amicas of the Agreements' warranties and remedies (Count III), alleging Fraud and Misrepresentation by Amicas (Count IV), and alleging unfair and deceptive trade practices by Amicas  in violation of M.G.L. c. 93A.

On December 23, 2008, the Court dismissed only that portion of Count IV of GMG's counterclaim which alleged fraud.  See Electronic Order of December 23, 2008.

II.    DISCUSSION

   **A.     Amicas' Motion to Strike**

Amicas has moved to strike GMG's Rule 56 statement of material facts which are not in dispute on the grounds that it is riddled with inadmissible hearsay and statements for which the affiants and deponents lack qualification. (Docket # 56).  The Motion is DENIED.  Nevertheless, many of Amicas' assertions regarding GMG's Rule 56 statement and the evidence offered in support thereof are well-founded and these evidentiary difficulties are addressed within the Court's Order on the cross motions for summary judgment rather than by exclusion of the totality of GMG's argument.  The problem Amicas raises – namely, that record evidence cited in support of assertions made in GMG's Rule 56 Statements often did not upon examine establish the assertions -- has considerably slowed resolution of the pending motions.

   **B.     Amicas' Motion for Determination That Privilege is Waived**

Amicas has moved pursuant to Fed. R. Civ. P. 26(b)(5)(B) and Fed. R. Evid. 502 for a determination that GMG has waived any attorney-client privilege associated with hundreds of

attorney-client communications produced by GMG in the course of discovery.  Docket # 64.

The Motion is DENIED, WITHOUT PREJUDICE.  GMG, "for the purposes of the pending summary judgment motions only, does not oppose the use by Amicas of any of the targeted documents already used by Amicas."  Docket # 69 at 5.  Thus, the resolution of this motion is unnecessary to resolution of the pending cross motions for summary judgment.

### C.    Cross Motions for Summary Judgment

Amicas has moved pursuant to Fed. R. Civ. P. 56 for Partial Summary Judgment on Count I of its Complaint (alleging Breach of Contract), and on each of GMG's remaining counterclaims.  Docket # 43.  GMG likewise moves for summary judgment on each of its remaining counterclaims.  Docket # 40.

### 1.    Applicable Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rogan v. City of Boston, 267 F.3d 24, 26 (1st Cir.2001)(citing Fed. R. Civ. P. 56(c)). Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir.1995)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  Moreover, the Court  is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir.1993).  Even so, the Court is to ignore

"conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir.2009).

       2.     Amicas' Motion for Partial Summary Judgment

Amicas moves for summary judgment on Count I of its Complaint asserting that GMG breached the Agreement. Specifically, it claims that the Parties entered into a binding, integrated contract, that it performed, and that GMG has terminated the contract improperly and withheld payment without basis (by failing to articulate any proper basis for invocation of the termination provisions, by invoking the Warranty after it had expired, and by failing to provide an opportunity to cure). Docket # 44. For the following reasons, Amicas' motion is ALLOWED.

       A.     The October, 2006 Agreements are the Operative Contract Documents

Amicas asserts that the October, 2006, Agreement – along with the several other documents executed at the same time – constitute the formal written agreement between the Parties. GMG disputes this assertion. While GMG does not dispute that the documents before the Court bearing the signatures of its representatives are the documents executed in October 2006, it nevertheless contends: (1) that Amicas misled or duped GMG into signing the documents on October 25, 2006, by advising it that the documents were identical to documents executed in late September, 2006 (other than minor changes to conform to handwritten edits made by GMG); (2) and, that other communications (both written and verbal, and occurring both before and after execution of the October Agreement) control the Parties' legal relationship, rather than the so-called "boilerplate" October Agreement. Docket # 50.

The first argument is without merit. On September 29, 2006, Amicas sent a proposal to GMG, in the form of four contract documents attached to an email. GMG concedes that its CFO

accepted the proposal by faxing back to Amicas the one-page Schedule A to the Agreement and the three-page application for financing both of which she signed on behalf of Defendant. Docket # 47-2 at 2-5, 9. The handwritten "Post-It Fax Note" indicates that the CFO sent twenty pages (i.e., all of the documents attached to the email) while the fax header line indicates that, on that transmission, she sent only four pages. Id. Plainly, the CFO signed a twenty-page document in the relevant locations, as evidenced by the copies from her file bearing her signatures. See, Docket # 52-3 at 20-36. Nonetheless, GMG disputes that its CFO delivered the remaining sixteen pages of signed documents and points to Amicas' failure to produce the received copy of the remaining documents. This objection misses the mark. Amicas' employee Hammond affirms that he "received a 20-page fax back from Arteaga [the CFO] on the evening of September 29, 2006, which included her signature on each of the contract documents, including the 9/29 Agreement." Docket # 53 at ¶ 14. Notably, no affiant disputes this assertion on behalf of GMG. Moreover, GMG executed virtually identical documents on October 25, 2006 – the only changes were to the precise name of the Defendant (an issue not now relevant) and the incorporation into the typed text on Schedule A of certain handwritten changes made by the CFO. The notion that the October Agreement was an "adhesion" document which GMG officials signed only because Amicas was "lying about the boilerplate" is unsupported. See, e.g., Docket # 50 at 6.

Accordingly, the Parties entered into valid, binding agreements with the operative controlling contract memorialized in the documents executed on October 25, 2006 (the Agreement).

The Agreement's integration clause provides:

This Agreement and any exhibits, schedules and attachments attached hereto

constitute the entire agreement between the parties and supersedes all prior or contemporaneous agreements, representations and proposals, written or oral, including the terms of any prior, contemporaneous or subsequent POs (except as set forth above) relating hereto, except for Customer's obligations to pay support or other fees under existing contract(s), if any, between the parties.

Docket # 48-1 at 22 (Agreement, § 1.1)**.**

GMG' second argument – that various representations or statements made before and after the Agreement, rather than the written contract, constitute the governing terms of the Parties' relationship – is without merit.  GMG's CFO signed the October Agreement.  "The general rule is, that, in the absence of fraud, one who signs a written agreement is bound by its terms whether he reads and understands it or not." Haufler v. Zotos, 446 Mass. 489, 501 (2006) (quoting Wilkisius v. Sheehan, 258 Mass. 240, 243 (1927))**.**

"In Massachusetts '[t]he parol evidence rule precludes evidence of earlier or contemporaneous discussions that would modify the provisions of a later integrated agreement which the proponent of the agreement seeks to enforce.'" Bank v. International Business Machines, 145 F.3d 420, 424 (1st Cir.1998) (quoting New England Fin. Resources v. Coulouras, 30 Mass.App.Ct. 140, 145 (1991)).  By its own terms, the Agreement is a "fully integrated document" which "represents the whole understanding of the parties." Id.; Docket # 48-1 at 22 (Agreement, § 1.1).  The Agreement states that "[t]his Agreement and any exhibits, schedules and attachments attached hereto constitute the entire agreement . . ." Docket # 48-1 at 22 (Agreement, § 1.1)  This contract language is unambiguous.

While "the settled rule of law is that a contracting party cannot rely upon such a clause as protection against claims based upon fraud or deceit  .  .  .  [t]his established rule is an exception to the basic principles concerning the freedom to contract and is  grounded upon public policy

concerns" sanctioning "the avoidance of a promise obtained by deceit." Sound Techniques v. Hoffman, 50 Mass.App.Ct. 425, 429 (2000). However, Massachusetts Courts have declined to extend that exception to encompass claims of negligent misrepresentation concluding that "it is intentional misconduct that justifies judicial intrusion upon contractual relationships in order to prevent the wrongdoer from securing contractual benefits for which he had not bargained." Id. at 433; see also Cummings v. HPG International, 244 F.3d 16, 21 (1st Cir.2001)("Where the legality of the bargaining process is not at issue, a party cannot avoid its contractual obligations by seeking recovery for negligent misrepresentation.")(citing Sound Techniques); See also Sullivan v. Southland Life Ins. Co., 67 Mass.App.Ct. 439, 444, n.4 (2006).

Here GMG challenges the bargaining process by asserting both intentional misrepresentation and that the Agreement is an adhesion contract.[3]  GMG advances several misrepresentations in its memorandum regarding integration of Amicas software with software from other vendors. (See, e.g., Docket # 50 at 4)("Mark Bowman's false statements prior to September 29, 2006 that Amicas had already interfaced with Sage;" "his separate and deliberate false representations after October 25, 2006 that Amicas easily could do so"). GMG's challenge is without merit for at least three reasons.

First, GMG has failed to support properly its assertions of misrepresentation (and, more generally, many of its factual allegations).  In its memorandum, GMG references "Mark Bowman's false statements prior to September 29, 2006." Docket # 50 at 5 (citing ¶¶ 2-12 of Docket # 41, GMG's Rule 56 Statement of Facts).  In its Rule 56 Statement, GMG asserts that

---

[3]  Neither the integration clause nor the parol evidence rule would preclude consideration of claims of fraud (supported by admissible evidence at this stage of the proceeding), however, no such claims remain pending in this case.

"Amicas represented to GMG that Amicas had prior successful experience providing RIS and PACS systems with interfaces compatible with Sage systems." Docket # 41 at ¶ 4 (citing Docket # 47-8, deposition of Elsa Vasquez at 12). The page of the Vasquez deposition cited, however, fails to support the GMG assertion. The only statement attributed to Bowman on the page cited is that Sage used the HL7 language which "was the industry standard and that integration was not an issue." Docket # 47-8 at 12. Similarly, in paragraph 9, GMG asserts that Amicas represented it had "substantial prior experience making an interface of Amicas compatible with 'foreign' or non-Amicas systems including the existing Sage systems at GMG." Docket # 41 at ¶ 9 (citing Docket # 47-8 at 12, 14-15). Again, the testimony cited does not support the factual assertion.

Second, even assuming arguendo that some such statements were made (e.g., that integration would not be an issue), and putting to the side any issues regarding whether the statements were made before the execution of the Agreement, the statements are nevertheless of no assistance to GMG because the record evidence before the Court establishes that Amicas had previously interfaced with Sage software. Docket # 52 at ¶ 4.

Specifically, Amicas' Vice-President for Sales in the Midwest Region affirms that "AMICAS products had successfully interfaced with WebMd/Medical Manager software, which was the name of the Sage software that was licensed by GMG from Emdeon, Sage's predecessor." Docket # 53 at ¶ 21. No evidence disputes this assertion specifically. Moreover, Amicas' implementation engineer affirms that "Sage advertises that its products are HL7 compatible, the entire purpose of which is to facility [sic] interfaces with foreign systems. Sage had an HL7 interface team, members of which AMICAS worked with, whose purpose was interfacing Sage software with 'foreign' systems." Docket # 54 at ¶ 21. Sage documentation (quoted by Amicas

employees in the course of collaborating with Sage employees on the interface) itself references its ability to interface with foreign systems. Docket # 47-3 at 16 ("Remote systems commonly choose to send this data using their own custom proprietary format. In such cases, our Intergy HL7 Batch Processing Interface team is able to handle the importing of such custom batch files by developing a corresponding HL7 Batch Preprocessor").

The contrary evidence offered by GMG is the testimony of GMG employee Vasquez that she was told by Sage employee Tom Wood on October 27, 2006, that Sage had never interfaced successfully with a foreign system (see, Docket # 47-8 at 7). In the face of the other evidence known to Amicas, Wood's statement does not support an inference of intentional misrepresentation by Amicas.[4] Moreover, Wood's statement is only relevant if offered for the truth of the matter asserted – and as such, it is inadmissible hearsay.[5] Thus, that statement fails to create a genuine issue of material fact and/or fails to warrant resort to parol evidence.

Third, GMG cannot establish a contract of adhesion or another defect in the legality of the bargaining process. Nothing in the record evidence establishes that Amicas engaged in "illegality, fraud, duress, unconscionability or any other invalidating cause." Sound Techniques, 50 Mass. App. Ct. at 433. The Parties negotiated at arms-length. GMG has multiple offices, 280 employees and annual revenues of between $23 and $25 million dollars. The only allegation of misrepresentation is the assertion noted above regarding prior successful interfaces. Nor does the

---

[4] Whether or not Amicas had, in fact, interfaced with Sage, the statements and knowledge Amicas possessed about Sage's systems and representations (which are un-rebutted) preclude an inference of intentional misrepresentation from statements such as "integration is not an issue."

[5] The omission of an affidavit or deposition from Wood is also notable, although I do not rely upon this fact.

record support the contention that this is a contract of adhesion, as nothing suggests that the bargaining powers or the Parties were unequal. Id. Finally, GMG's allegations of misrepresentations after the October Agreement do not defeat or alter the plain terms of the contract.

Accordingly, the October 15, 2006, Agreement constitutes the binding contract between the Parties.

B.    AMICAS Performed and GMG Breached

Amicas claims that GMG breached when GMG terminated the Agreement on June 30, 2008, without basis and that therefore GMG has withheld payment without justification in violation of the Agreement's terms. GMG's asserts in defense, as well as in its own motion, that Amicas failed to satisfy Amicas' obligation under the contract to provide working software and thus termination was justified.

GMG's termination notice was predicated upon Amicas's "failing to conform to the Documentation and not delivering a functional product." Docket # 48-3 at 11. As noted previously, the Documentation (see supra at 3, n. 1) has not been provided to the Court and, at the hearing, counsel for the parties indicated that they did not believe the Documentation would assist the Court in resolving the pending motions. In addition, neither party has cited any of the Documentation to establish that the software did, or did not, conform. Accordingly the dispute (whether framed as "did GMG breach by terminating without basis?" or, as "did Amicas breach by failing to perform?") concerns whether Amicas delivered a functioning product. The competent record evidence fails to support GMG's contention – even giving all reasonable inferences to GMG as the non-moving party on Amicas' motion.

In moving for summary judgment, Amicas has advanced competent evidence (principally, but not exclusively in the form of the affirmation of its implementation engineer) that it did in fact provide a functioning product, and that it responded meaningfully to each of GMG's concerns. See, supra at 8-13. While GMG is entitled to all inferences in its favor as the non-moving party, it has advanced curiously little competent evidence concerning the nature of the alleged deficiencies of the Chargeout Interface.

First, Elsa Vasquez (who affirmed that she was the GMG employee with responsibility for ensuring that the practice's information technology functioned effectively, Docket # 18 at ¶ 3) was unable in her testimony to articulate (beyond vague generalities that the Chargeout Interface did not work) any failure of Amicas to perform under the Agreement, or any specific failure of the Chargeout Interface. Docket # 47-6 at 6-7; Docket # 18. Her affidavit sheds no further light on the subject (saying only that the interface was not functional). Docket # 18. Such a conclusory opinion at summary judgment is insufficient to create a genuine issue of material fact (or support entry of judgment in GMG's favor). See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990) ("[t]he test for summary judgment is steeped in reality. Although the remedy must be withheld if material facts are authentically disputed, there is a burden of production . . . summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation").

Moreover, Vasquez admitted to a lack of technical knowledge (see, supra, at 5-6, including her admission that she was unfamiliar at the time of the litigation with the terms "batch file" or "shared drive," concepts key to an understanding of the Chargeout Interface) and she is not qualified to offer a conclusory opinion regarding the reason that the Amicas and Sage software

did not communicate without incident.

Additionally, the competent record evidence demonstrates convincingly that the implementation of a successful Chargeout Interface required the cooperation of Amicas, GMG and Sage (see, e.g., supra at 4-5; Docket # 54 at ¶ 12). On behalf of Amicas, Helms, the implementation engineer, affirmed that the Chargeout Interface functioned properly and that the implementation problems that arose resulted from data entry errors or mishandling by Sage's batch processor, not a failure of the Amicas software. This affidavit is unrebutted. No affiant affirms on behalf of GMG that Sage was not to blame for the perceived failures of the interface, that GMG maintained consistent data sets, or otherwise disputes Helms's assertions. GMG has not offered evidence concerning what was wrong with Amicas' product from any employee of its own with any degree of technical expertise. Likewise, none of the three Information Technology consultants employed by GMG during the relevant period has given any evidence contradicting Amicas' engineer's affirmations that GMG experienced difficulties with the Chargeout Interface because GMG failed to maintain consistent data sets. Docket # 54 at ¶ 12.[6]

Third, the record evidence establishes that both Sage and GMG were not always working with Amicas to resolve interface issues. See, e.g., supra at 6-7 (summarizing evidence concerning Sage-related delays during implementation); supra at 12-13 (summarizing record with regard to June, 2008, attempts to address GMG's concerns and a lack of cooperation from both GMG and Sage, including Sage's reference to its own negotiations to replace Amicas and its assumption that it should cease cooperating with Amicas). Additionally, GMG acknowledged in an email to

---

[6] Indeed, Vasquez testified that she did not know whether or not anyone at GMG had ever considered whether the problems it perceived with the Chargeout Interface were possibly due to failures of either Sage or GMG itself. Id.

Amicas that its own database issues contributed to at least some degree to the perceived problems with the Chargeout Interface.  Docket # 47-4 at 6 ("I am not sure that we are not our own worst enemy now due to the number of record variances that somehow got created in RIS live").

Finally, the record reflects that Amicas responded to each of the difficulties that arose with respect to the Chargeout Interface between July, 27, 2007, and October, 2007,[7] and that GMG did not notify Amicas of any subsequent issues with the Chargeout Interface – and did not tell Amicas that GMG had begun processing charges manually -- for a period of between five and seven months, ending in February, 2008.  See  7-8, supra; Docket # 52-2 at 23-24.  At that point, Amicas began the process of working to clean up problems in the data that had developed so that GMG could again use the Chargeout Interface.  Docket # 54 at ¶¶ 15-16.  Later in that process, GMG and Sage did not proceed to assist on their sides to bring that process to completion.  At the time of termination, GMG and Sage had not completed their portion of the work to complete that process, and at some point following termination GMG instructed Sage not to complete the work. Id. at ¶ 16; Docket # 47-7 at 4.

In short, there is no competent record evidence that contradicts the affirmation of Amicas' implementation engineer Adam Helms that any failures of the Chargeout Interface "to work" arose from GMG's own failure "to maintain consistent sets of data in both systems or consistently

---

[7] That is, Amicas responded to each problem which is reflected in the record evidence.  If there were (as represented by counsel at hearing and as is maintained in the briefing) many additional complaints to Amicas, they are not reflected in the record evidence before the Court. Representations of counsel are insufficient to overcome the sworn affirmations of Amicas personnel to the contrary and to create a genuine dispute of material fact.

identify patients as instructed by AMICAS."[8]  Docket # 54 at ¶ 12.

Notably, Section 9.1 of the Agreement (the purported basis of GMG's termination) excuses Amicas from any obligation to "repair, replace, or grant a refund with respect to any AMICAS software that does not conform to its Documentation as a result, in whole or in part, of one or more of the events indicated in Section 12.4," which includes exclusions for "problems caused by customer's data" and "third party databases."  Docket # 48-1 at §§ 9.1, 12.4.

Thus, GMG's invocation of the termination provisions of Section 4.2 of the Agreement on the basis of the Warranty was unjustified on the factual record before the Court, and GMG was in breach of the Agreement when it withheld payment from Amicas on this basis.  Drawing all reasonable inferences in GMG's favor, Amicas has established that it delivered a functioning product.  In light of these conclusions, the Court need not address the parties' disputes over whether or not GMG's termination was timely either under the Agreement or the UCC and whether or not GMG denied Amicas the opportunity to cure after the June 2008 termination notice.

C.    GMG's Claim of Breach by Amicas on March 13, 2007

The ninety-day warranty period in the Agreement commenced upon the "Go Live Date," defined in the Agreement as "the date when live data can be processed through any of the AMICAS software for commercial purposes." Id. at 22. (Agreement, § 1.2)(emphasis added). All the Amicas Software, other than the Chargeout Interface, went live on March 13, 2007.  GMG

---

[8]  By way of example provided at the hearing, various billing or diagnostic codes derive from insurance plans.  Both the Sage and Amicas software at GMG required these codes, but in different formats.  Thus, when the insurance plans or codes changed, GMG had to update this information both in the Sage and Amicas systems.  A failure to do so could cause billing errors or inconsistencies.

now contends that Amicas was in violation of Amicas' promise that "AMICAS Software will substantially conform to the Documentation," Id. at 24 (Agreement, § 9.1), starting on the Go Live Date in that the Chargeout Interface did not work.

Even assuming that Amicas was in breach beginning on March 13, 2007, it cured that breach in late July, 2007 when it delivered the Chargeout Interface and GMG used it. The Chargeout Interface worked, accordingly, this alleged breach provided no basis in June, 2008, to terminate the Agreement. There is no evidence that GMG invoked the provisions of Section 4.2 in order to terminate the Agreement during that time period between March 13, 2007 and late July, 2007. To the contrary, GMG accepted that the Chargeout Interface was not ready and agreed to process charges manually. Docket #47-8 at 3.

For the foregoing reasons, Amicas's Motion for Partial Summary Judgment as to Count I of its Complaint is ALLOWED, as is that portion of its motion seeking summary judgment on GMG's contract counterclaims in Counts I, II and III.

3.      GMG's Cross Motion For Summary Judgment on Its Counterclaims

GMG has filed a Cross Motion for Summary Judgment (Docket # 40) seeking summary judgment on each of its counterclaims. For the reasons articulated in the Court's findings, supra, (concerning the existence of a binding contract (the October Agreement), the lack of competent evidence establishing either a failure by Amicas to deliver a working product, or any specific misrepresentations made by Amicas, and the evidence establishing a breach by GMG), GMG's motion is DENIED.

Count I of GMG's counterclaim is for Breach of Contract, with regard to both oral representations and the Agreement. For the reasons discussed supra, GMG has not established a

breach of the Agreement by Amicas, and the Court has found that the Agreement is an integrated document which represents the entire agreement of the Parties (rendering any oral representations non-actionable).

Count II is for a declaratory judgment that GMG validly terminated the Agreement and that the terms of the Agreement were unconscionable and unenforceable. As discussed supra, the Court has found that the Agreement is an enforceable and binding contract, that GMG's termination was invalid and that GMG in fact breached the Agreement.

GMG's arguments in favor of Count III (asserting breaches of express and implied warranties) are predicated upon factual assertions which the Court has found, supra, to be unsupported by the record evidence, namely:[9] (1) a failure by Amicas to deliver a working product and, (2) a September 29, 2006, Agreement which differed meaningfully from the October Agreement and is the controlling agreement between the Parties. Likewise, the Court has found that there is no record evidence supporting a finding of unconscionability, as the Parties were sophisticated commercial entities bargaining at arms-length and with no indication of unequal bargaining power.

Count IV is for Negligent Misrepresentation. The Court has found that the Agreement is the binding contract between the Parties, and it contains an integration clause under which GMG disclaims reliance on any representations other than those in the Agreement. In these circumstances and in light of the findings noted above, GMG may not prevail on its summary judgment motion and Amicas is entitled to summary judgment on its motion. Sound Techniques, 50 Mass.App.Ct. at 429-433.

_____

[9] See GMG's memorandum in support of the Motion at Docket # 42, 10 ff.

Count V is for violation of c. 93A. The Court has found previously that even drawing inferences in GMG's favor where it was the non-moving party (see, supra, at 20-22) there was no evidence of statements amounting to intentional misrepresentations. Accordingly, GMG cannot, in these circumstances, prevail on summary judgment on this claim and Amicas is entitled to summary judgment on its motion on this claim.

Accordingly, GMG's motion for summary judgment on its counterclaims is DENIED, and that portion of Amicas's motion seeking summary judgment on GMG's counterclaims in Counts IV and V is ALLOWED.

III.    CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Partial Summary Judgment (Docket # 43) is ALLOWED, the Defendant's Motion for Summary Judgment on its Counterclaims (Docket # 40) is DENIED, the Plaintiff's Motion for a Determination that the Defendant has Waived Privilege (Docket # 64) is DENIED, WITHOUT PREJUDICE; and the Plaintiff's Motion to Strike (Docket # 61) is DENIED.

It is further ORDERED that the Parties shall within twenty (20) days of this Order file status report(s) setting forth their respective positions as to a schedule for resolution of any matters remaining in this lawsuit.


_____/s / Leo T. Sorokin_____
UNITED STATES MAGISTRATE JUDGE